**John C. STANTON, Plaintiff,**

v.

**LIGHTHOUSE FINANCIAL SERVICES, INC., and Thomas S. Drunsic, Defendants.**

**Civil Action No. 06cv10566–NG.**

United States District Court, D. Massachusetts.

March 25, 2009.

Jonathan J. Margolis, Lori A. Jodoin, Rodgers, Powers & Schwartz LLP, Boston, MA, for Plaintiff.

Michael B. Feinman, Law Offices of Michael B. Feinman, Andover, MA, Stephen P. Shannon, Law Office of Michael B. Feinman, North Andover, MA, for Defendants.

*MEMORANDUM AND ORDER RE: MOTIONS FOR RECONSIDERATION AND TO AMEND*

GERTNER, District Judge:

## I. INTRODUCTION

This case involves a suit for unpaid wages by a company president against the startup he founded and its CEO. The president's contract allowed for the deferral of his wages at the discretion of the board of directors. The plaintiff's allegations sound in breach of contract, breach of fiduciary duty, and violation of the Massachusetts Weekly Wage Act ("Wage Act"). On July 8, 2008, I ruled that the plaintiff was an "employee" under the Act but denied the parties' cross-motions for summary judgment because both the breach of contract and Wage Act claims turned on disputed factual issues: the time during which salary could be deferred, the extent to which payment was contingent on profitability, and whether the board ever voted to defer his salary. Agreeing that the salient fact is that the plaintiff's contract allowed the deferral of wages under certain conditions, whatever they may be, the parties now seek reconsideration of the Wage Act claim. The defendants have also filed a motion to amend their answer, in order to add set-off and in pari delicto defenses.

I now reaffirm my prior ruling that the plaintiff in this case is an "employee" under the Act. An individual may be an employer vis-à-vis subordinates and an employee vis-à-vis superiors. And while the Wage Act was intended to protect those who could not bargain for their salary, like lower wage earners, the language of the Act sweeps broadly. I cannot read textual exceptions that are not there. Because I also hold that the plaintiff's base salary constitutes "wages" under the statute and that an agreement to defer wages is void under the statute, I **GRANT** the plaintiff's motion for reconsideration and **DENY** that of the defendants. Further, I **DENY** the defendants' motion to amend, as neither the set-off defense nor the in pari delicto doctrine apply in this case.

## II. FACTS

Lighthouse Financial Services, Inc. ("Lighthouse"), a startup company specializing in payment processing services, incorporated in Massachusetts on September 4, 2002. Compl. ¶ 6 (document # 26). John Stanton, its co-founder, recruited Thomas Drunsic in the fall of 2002 to join the company as an investor. On March 28, 2003, Drunsic purchased 500 shares of Lighthouse stock at $130 per share, for a total investment of $65,000. Stanton also purchased 500 shares by investing between $30,000 and $34,000 and receiving credit for work done for Lighthouse between November 2002 and March 2003.

On April 1, 2003, with corporate counsel present, both Stanton and Drunsic signed employment contracts with Lighthouse. Stanton became the president, and Drunsic became the chief executive officer. The contracts were for a term of one year and fixed each individual's salary at $144,000. Stanton and Drunsic signed one another's contract on behalf of Lighthouse. Both contracts contained the following provision: "Salary for the first year may be deferred at the sole discretion of the Board of Directors and must be paid out before the distribution of any profits of the corporation." Margolis Aff., Exs. G, H (document # 26–3). According to Drunsic, this salary deferral clause was mutually negotiated between Stanton and Drunsic, with the assistance of corporate counsel, "to recognize the fact that the company was in no position to pay those salaries until it was profitable." Drunsic Dep. at 40 (document # 33). Stanton alleges that there was no formal record of the Board of Directors ever electing to defer salaries.

Pl.'s Mem. Supp. Mot. Part. Summ. J. (document # 27). He admits, however, that although he signed Drunsic's employment agreement, he felt no responsibility to make a salary payment to Drunsic "because neither the company nor myself had any money." Stanton Dep. at 86–87 (document # 33).

From April through June 2003, Drunsic purchased 410 additional shares of stock and became the majority shareholder, while Stanton purchased only fifty-five more shares.[1] From July 2003 through February 2004, Drunsic continued to infuse capital into Lighthouse, buying another 960 shares of stock. He began taking money out of his 401(k) account to meet the company's basic operating expenses. Stanton bought 100 shares on August 11, 2003, but did not make any subsequent purchases. Because he had not been receiving his salary, Stanton began living on money that he had borrowed.

Also in 2003, Drunsic and Stanton persuaded Steven Monticone to invest in the company. On December 5, 2003, he purchased 800 shares for $104,000.00. With this investment, Monticone supplanted Stanton as the second largest stockholder.

In February 2004, Drunsic informed Monticone and Stanton that the company was in need of more cash to pay bills. Monticone and Drunsic each purchased 200 shares on February 27, 2004. Monticone's recollection is that Stanton was unable to purchase more shares due to his financial situation, and a discussion of his shares being diluted subsequently followed.

Monticone also remembers a meeting with Stanton and Drunsic at which Stanton stated that he needed to receive a salary soon to pay his living expenses. Drunsic likewise recalls Stanton raising this issue, most likely in February 2004. Drunsic told Stanton that the company did not have the resources to pay salaries and refused to withdraw further funds from his 401(k) to pay Stanton's salary.

On May 12, 2004, Stanton sent an e-mail to Drunsic, Monticone, and a third person explaining that he needed several weeks off in order to tend to a family matter. Two days later, Drunsic and Monticone each purchased 100 more shares of stock.

On May 28, 2004, Lighthouse held its quarterly board of directors meeting. Drunsic, the chairman, Monticone, a director, and David Milton, another director, were all present. Stanton had received notice of the meeting but elected not to attend, as he believe he might feel "uncomfortable" there. Stanton Dep. at 174 (document # 33). During the meeting, Drunsic proposed that the company create the position of vice chairman and name Monticone to the seat. The resolution passed.

The directors also discussed salaries for the upcoming year. Drunsic proposed $120,000 for himself, $100,000 for Monticone, and $80,000 for Stanton. This resolution allowed salaries to change subject to the discretion of the board, and that all compensation be deferred subject to subchapter S regulations. According to the meeting minutes, "total deferred compensation would be paid at the rate of 75% of the profits from the income generated 60 days prior, provided that there was a profit from the income generated 90 days prior, and that any deferred compensation

---

1. In his complaint, Stanton alleges that during this time Drunsic took actions to freeze Stanton out of the process of running the corporation, including taking physical custody of checkbooks and records, signing alone checks that required dual signatures, and changing the password for electronic access to the corporation's operating account without giving Stanton the new password. Drunsic denies all of these allegations.

accrued under the resolution as of May 31, 2010 be forfeited." Margolis Aff., Ex. M (document # 26–3). The board then decided that Drunsic and Stanton would become at-will employees, since their original one-year contracts had expired on April 1, 2004. *Id.*

At some point during Stanton's time off, Drunsic sent an e-mail to Stanton saying that he would reissue Stanton's parking pass and cell phone upon his return to the company. Stanton Dep. at 179 (document # 33). According to Stanton, Drunsic also asked for his computer password at one point. *Id.* Around June 3, Stanton determined that he would not return to Lighthouse, and he informed Drunsic of his decision in a June 14 email.

On July 17, 2004, Stanton filed a complaint for nonpayment of wages with the Attorney General, pursuant to Mass. Gen. Laws ch. 149 § 150, claiming $186,003 in gross unpaid wages earned from April 1, 2003, to June 14, 2004. On January 3, 2005, Lighthouse filed for bankruptcy. On Schedule F of its petition, a form listing creditors holding unsecured nonpriority claims, the corporation stated that it owed $180,256.43 to Stanton, $262,000.00 to Drunsic, and $58,333.24 to Monticone for "deferred compensation." Margolis Aff., Ex. P (document # 26–4). On December 2, 2005, the bankruptcy judge granted the U.S. Trustee's motion to dismiss. *Id.*[2]

## III. PROCEDURAL HISTORY

Stanton filed this suit on March 30, 2006, raising claims for breach of contract against Lighthouse (Count I), violation of the Wage Act against Lighthouse and Drunsic (Count II), and breach of fiduciary duty against Drunsic (Count III). On April 20, 2006, the defendants answered, raising counterclaims for breach of contract, breach of fiduciary duty, and violation of Mass. Gen. Laws ch. 93A.

On February 5, 2007, I granted the plaintiff's motion on the pleadings as to the defendants' counterclaim for breach of contract, which was based on Stanton's alleged violation of his covenant not to compete. Because the covenant applied only to the time period during which Stanton was employed by Lighthouse, his post-employment activity could not constitute a violation of that covenant.

On January 30, 2008, Stanton moved for partial summary judgment on his Wage Act claim. On February 20, 2008, the defendants filed a cross-motion for partial summary judgment on Stanton's Wage Act and breach of contract claims. In an electronic order dated July 8, 2008, I held that Stanton was an "employee" for the purposes of the Wage Act, but denied summary judgment as to both claims because they turned on disputed factual questions about the deferral clause in Stanton's contract (the amount of time the salary could be deferred, the extent to which payment was contingent on profitability). These issues appeared to require consideration of parol evidence.

On July 21, 2008, Stanton filed a motion to reconsider (document # 38), arguing that the cross-motions for summary judgment turned not on an interpretation of the contract, but on an interpretation of the Wage Act. He contends that his employment contract's deferral provision is unenforceable as it is in violation of the Act. On August 1, 2008, the defendants filed their own motion to reconsider, agreeing that the case called for an interpretation of the Wage Act. They argue that the Wage Act does not forbid deferral arguments, and they further ask that I reconsider my judgment that Stanton

---

**2.** The record does not reflect the grounds for the dismissal.

qualifies as an "employee" protected by the Act. Finally, the defendants have also filed a motion to amend their answer (document # 39) to add two affirmative defenses. I address the Wage Act issues before turning to the motion to amend.

## IV. MOTIONS TO RECONSIDER

█ The Massachusetts Weekly Wage Act requires that "[e]very person having employees in his service shall pay weekly or bi-weekly each such employee the wages earned by him to within six [or seven, depending on length of the work-week] days of the termination of the pay period during which the wages were earned." Mass. Gen. Laws ch. 149, § 148.[3] The Act allows an employee to recover treble damages, attorney fees, and costs.

█ To make out a Wage Act claim, Stanton must prove (1) he was an employee under the statute; (2) his deferred compensation constitutes a 'wage' under the statute; (3) the defendants violated the Act by not paying him his wages in a timely manner; and (4) the individual defendant Drunsic was a corporate officer as defined by the statute. *See Allen v. Intralearn Software Corp.*, No. 05–WAD–03, 2006 WL 1277813, at *1 (Mass.App.Div. Apr. 24, 2006).

The parties dispute the first two elements. As to the third element, they agree that Stanton's contract allowed the board to defer his compensation and that Stanton was never paid his salary (save for a one-time sum of $6,000), but they disagree on whether such deferral arrangements are permissible under the Wage Act.[4] Finally, they agree on the fourth element, that Drunsic is an employer under the Act because he is an officer "having the management of the corporation." § 148.

Thus, there are two parts to the analysis of Stanton's Wage Act claim: First, is he eligible for protection under the Act? This question depends on whether he was an "employee" and whether his deferred salary constituted "wages" as defined by the statute. Second, if the Wage Act does apply, does Stanton's contractual provision allowing his compensation to be deferred violate the Act's prohibition on special contracts seeking to side-step the statute?

### A. Stanton's Eligibility for Protection Under the Act

### 1. Whether Stanton Is an "Employee"

█ In my electronic order of July 8, 2008, I held that "it seems relatively clear that Plaintiff was an 'employee' within the meaning of the Wage Act, if not for the entire period of his employment, then at least for some of it." I now reaffirm that holding.

█ Under the statute, an "employee" is "an individual performing any service," with limited exceptions not relevant here.[5]

3. "Despite its subtitle, 'nothing in the weekly wage law itself requires the weekly payment of wages.'" *Okerman v. VA Software Corp.*, 69 Mass.App.Ct. 771, 775, 871 N.E.2d 1117 (2007).

4. The parties also dispute whether the contract required that any deferral be based on the profitability of the company and when the Board actually voted to defer Stanton's compensation. As I stated in my electronic order of July 8, 2007, these are disputed issues of

material fact reserved for trial should I find the deferral provision enforceable.

5. The Act excludes from coverage tradesmen and professionals who perform services free of the control of the employer and outside the employer's usual course of business. Mass. Gen. Laws ch. 149, § 148B. It also excludes employees of certain hospitals, certain shareholder-employees of cooperative associations, and casual employees employed by the state or local government. *Id.* § 148.

Mass. Gen. Laws ch. 149, § 148B. The Wage Act "creates a rebuttable presumption that any individual 'performing any service' for another is an employee for purposes of Section 148." *Kohli v. RES Eng'g, Inc.*, No. 00–02458, 2000 WL 1876605, at *2 (Mass.Super.Ct. Dec. 19, 2000). The defendants advance two arguments to rebut this presumption: (1) the Wage Act should not apply between co-venturers in a startup business, and (2) Stanton cannot bring a claim because he also qualifies as an "employer" under the statute.

Their first argument seeks to exclude startup co-venturers as analogous to "cooperative associations," which are specifically exempted from coverage under § 148. Defs.' Mem. in Support of Cross-Mot. Summ. J. at 8 (document # 30). The defendants cite no case law for this proposition, and indeed they cannot, as no court has ever excused a startup entity from the statute's commands on this basis. Moreover, cooperative associations have a unique purpose and structure, distinct from those of ordinary corporations. These associations "are formed for the mutual benefit of persons who, more or less closely, are neighbors, and whose greatest interest in them is the opportunity to purchase supplies of good quality at a low price, or to dispose to advantage of farming products or the like, rather than to have a fixed investment of interest-yielding capital." *Lindsay v. Arlington Co-op. Ass'n*, 186 Mass. 371, 373–74, 71 N.E. 797

(1904). Lighthouse was organized as a standard corporation, albeit a closely held one, with the goal of profitability that would benefit shareholders in proportion to their unequal ownership stakes. Accordingly, any analogy between startups and cooperatives is inappropriate.[6]

The defendants' second argument is that one who qualifies as an employer under the Act—as Stanton does, having served as the company's president, § 148—may not also claim its protection as an employee. Only one case has addressed this question directly. In *Olsson v. E.F. Institute for Cultural Exchange Inc.*, No. 00–4075 (Mass.Super.Ct. July 20, 2001), the court granted a motion in limine barring the parties from making reference to the Wage Act based on its holding that the plaintiff, as former president of the company making a $500,000 base salary and $100,000 in bonuses, could not state a claim for unpaid wages in the posture of an employee. For the reasons that follow, I decline to follow this case.

The court's textual analysis did not demand the result it reached. The court wrote, "[b]ased on the clear, unambiguous statutory language, Olsson is the employer for purposes of G.L. c. 149 § 148 and thus is precluded from being an employee able to recover under this statute." *Id.* at 3. The first clause of that sentence is indisputable: the plaintiff served as president and so was an employer by statutory definition. The second part does not neces-

---

**6.** Indeed, the statutory definition of a cooperative association clarifies its distinct structure: "A corporation may be organized under chapter one hundred and fifty-six B, with shares having par value, for the purpose of co-operation in carrying on any business or of co-operative trade." *Id.* ch. 157, § 1. "Such corporation shall distribute its earnings or profits among its workmen, purchasers and stockholders at such times and in such manner as its bylaws prescribe, but at least once

in every twelve months. No distribution shall be made, unless at least ten per cent of the net profits have been appropriated for a contingent or sinking fund, until an amount has accumulated equal to thirty per cent of its capital stock issued and outstanding. No person shall hold shares in any such corporation to an amount exceeding one thousand dollars at their par value, nor shall a stockholder be entitled to more than one vote upon any subject." § 2.

sarily follow: by the plain text of the statute, which defines an employee broadly as one who performs service, a president could be liable as an employer *and* protected as an employee in different contexts. The *Olsson* court held that such an interpretation strips the word "employer" of its substantive meaning and defines it simply as one who may be sued. *Id.* at 3. That logic ignores the fact that a person can play different roles within the same institution—one might fit the statutory definition of employer due to her level of responsibility, but nonetheless be subordinate to others in the corporate hierarchy.

The *Olsson* court also based its holding on the purpose of the Wage Act as articulated in *Baptista v. Abbey Healthcare Group, Inc.*, No. 95–10125, 1996 WL 33340740 (D.Mass. Apr. 10, 1996). There, the court expressed the intent of the Wage Act as "to protect laborers and casual wage earners who might otherwise be vulnerable to employer intimidation." *Id.* at *4. In *Olsson*, then, the court held that the plaintiff did not require protection because "there is nothing about [his] conduct which indicates that he has been intimidated in any way." No. 00–4075, at 4; *see also Dennis v. Jager, Smith & Stetler*, No. 98–4974G, 2000 WL 782946 (Mass.Super.Ct. Apr. 10, 2000) (noting that "[t]here is no reason to extend to highly paid professionals the opportunity to collect treble damages"). But as *Baptista* concerned the separate issue of whether contingent stock options constituted "wages" under the Act, its view of the Act's purpose was dicta and the court understandably did not conduct a thorough legislative history or textual analysis to reach it. *Id.* at *4. Moreover, subsequent cases have firmly rejected any reading of the Act that limited it to low-level employees. In *Kohli v. Res Eng'g, Inc.*, No. 00–02458, 2000 WL 1876605 (Mass.Super.Ct. Dec. 19, 2000), the court

allowed a company vice president earning $95,000 annually plus bonus to state a claim under the Wage Act:

> [S]ection 148 explicitly refers to "employees engaged in a bona fide executive, administrative or professional capacity" in the context of permitting said employees to be paid biweekly, semi-monthly or, at the employee's option, monthly instead of requiring them to be paid within six days of the termination of the pay period as is the case with most other employees. G.L. c. 149, § 148. Section 148 goes on to provide that "the words salaried employee shall mean *any* employee whose remuneration is on a weekly, bi-weekly, semi-monthly, monthly or annual basis . . . ." G.L. c. 149, § 148 (emphasis added). Section 148 explicitly lists categories of employees to whom "[t]his section shall not apply." One of those categories is not highly paid employees. Had the Legislature intended the Wage Act to apply only to low-wage employees, it surely would have explicitly so said. The plain and unambiguous statutory language demonstrates that executive and professional employees, no matter how highly compensated they may be, are protected by the Wage Act from the unreasonable detention of their salary.

*Id.* at *2. Similarly, the state appeals court allowed a manager making $90,000 to sue under the Act in *Okerman v. VA Software Corp.*, 69 Mass.App.Ct. 771, 871 N.E.2d 1117 (2007). The court was unequivocal: "We also find no support for VA's suggestion that the application of the wage act may be validly confined to employees who earn less than a 'healthy' salary, or to those who rely on their weekly wages for their day-to-day existence." *Id.* at 777, 871 N.E.2d 1117. "In fact," it continued, "in the fourth paragraph of the wage act, where the Legislature saw fit to exclude

certain types of employees from the wage act's protection, it did not place among the excluded those who are highly compensated." *Id.*; *accord. Sword v. Biofertec, Ltd.* ("*Sword I*"), 2002 WL 31957008, at *2 (Mass.Super.Ct. Dec. 2, 2000) (finding it "clear that a highly paid corporate executive ... may bring an action under G.L. c. 149 § 148").

Finally, I can find no case that has relied on *Olsson*; even the parties did not brief it. Furthermore, at least one other case has suggested the opposite result. In *Kohli*, the defendant argued that the plaintiff, a vice president for engineering, could not sue as an employee under the Wage Act because he qualified as an employer by virtue of being an "officer or agent having the management of such corporation." The court did not reach the issue because the plaintiff's level of responsibility was not clear. *Id.* at *3. Nonetheless, it commented that "[i]t does not necessarily follow that a person cannot be both an employer and an employee for purposes of section 148." *Id.* The court gave the following example:

> There appears no reason to assume, for example, that the Legislature intended to deprive a comptroller of the right to seek treble damages under chapter 149 if the president of the corporation for whom he works decides, on a whim, not to pay the comptroller's salary even if, under some circumstances, the comptroller himself would incur personal liability for failure to timely pay employees.

*Id.* at *3.[7] Because I agree with the *Kohli* court, I hold that Stanton is an employee who may bring suit under the Wage Act.

### 2. Whether Stanton's Unpaid Salary Was a "Wage"

■ Somewhat obliquely, the defendants also argue that Stanton's annual salary did not amount to "wages" covered by the Wage Act. This is an unlikely argument, as the statute uses the terms "wages" and "salaries" interchangeably. *See, e.g.,* § 148 ("employees whose salaries are regularly paid ... at a weekly rate ... may be paid bi-weekly or semi-monthly unless such employee elects at his own option to be paid monthly"). Nonetheless, Lighthouse and Drunsic cite *Boston Police Patrolmen's Association v. City of Boston,* 435 Mass. 718, 761 N.E.2d 479 (2002), for the proposition that "[t]he Supreme Judicial Court has stated that deferred compensation contributions are not wages under the Massachusetts Wage Act." Defs.' Mem. in Support of Cross–Mot. Summ. J. at 8 (document # 30). Because the instant case is clearly distinguishable and the plain text of the statute holds otherwise, I reject their argument.

In *Boston Police,* law enforcement officers sued the city for violation of the Wage Act because their contributions (drawn from their paychecks) to a tax-exempt,

---

7. In *Olsson,* the court noted in a footnote that "[t]here is no appellate court decision on this issue of whether a former president of a company may rely on this statute. In other courts, U.S. District and other Superior Court Judges have considered whether and when employees may bring claims under this statute; none of those decisions have dealt with claims of either a President or Treasurer ...." No. 00–4075, at 3 n. 1. That changed six years later in *Kittredge v. McNerney,* No. 03–2146, 2004 WL 1147449 (Mass.Super.Ct.

May 7, 2004), in which a company's former president and treasurer brought suit under the Wage Act to recover wages they would have earned in the future had they not been terminated. The court held that the Wage Act creates a cause of action only for wages due for work already performed and dismissed the complaint. It suggested, however, that had the claim been for overdue wages, "then the defendants *may* be personally liable under the Wage Act to pay this earned salary, trebled." *Id.* at *2 (emphasis added).

deferred-compensation retirement fund were not being deposited within seven days of the end of each pay period. The Supreme Judicial Court held that these monies were not "wages" under the Act. *Id.* at 481. There, however, the deferrals were made pursuant to state law to qualify the officers for federal tax benefits. The Internal Revenue Code required that the funds "remain ... solely the property and rights of the employer" until disbursed to the employees. Thus, the officers could not claim they were due these funds under the Wage Act; to so hold would deprive them of their ability to earn interest on that portion of their salaries. *Id.* There is no comparable scheme involved in Stanton's agreement to defer payment of his salary. Even if retirement benefits can be deemed something other than wages in certain circumstances, it is not reasonable to argue that an employee's base salary itself does not constitute a wage.

The defendants also cite a number of cases suggesting that compensation payable only upon some contingency is not a "wage" under the Act. *See Cumpata v. Blue Cross Blue Shield of Mass., Inc.*, 113 F.Supp.2d 164, 168 (D.Mass.2000) (employee's commissions contingent on exceeding sales quotas were not wages); *Dennis*, 2000 WL 782946, at *1 (contract attorney's draw was not a wage because it was "contingent on a number of factors"); *Baptista*, 1996 WL 33340740, at *4 (executives' stock options were not wages). But as the court noted in *Dobin v. CIOview Corp.*, No. 01–00108, 2003 WL 22454602 (Mass.Super.Ct. Oct. 29, 2003), these cases are distinguishable from a situation in which an employee agrees to defer her salary pending profitability of the company. In the latter, the individual's "salary

[i]s not contingent upon *her* performing any condition beyond performing her job." Indeed, the defendants' own cases distinguish themselves from the situation of unpaid base salary. *See Cumpata*, 113 F.Supp.2d at 168 ("Here, it is undisputed that the disputed commission was above and beyond Cumpata's base salary."); *Dennis*, 2000 WL 782946, at *1 (describing contract attorney's compensation as "irregular"). "[H]ad these employees sued for their base salaries, nothing in the reasoning of the courts impl[ies] that the compensation would not have been considered a wage under the Act." *Sword I*, 2002 WL 31957008, at *3 (holding that salary deferred until company had sufficient funds to pay constituted "wages" under the Act). For all the foregoing reasons, I find that Stanton's base salary does constitute "wages" under the Wage Act.

### B. *Does the Deferral Provision Violate the Wage Act?*

■ The Supreme Judicial Court has held that the Wage Act was designed "primarily to prevent unreasonable detention of wages." *Boston Police*, 435 Mass. at 720, 761 N.E.2d 479; *Am. Mut. Liab. Ins. Co. v. Comm'r of Labor & Indus.*, 340 Mass. 144, 147, 163 N.E.2d 19 (1959). To serve this purpose, it includes the following specific prohibition: "No person shall by a special contract with an employee or by any other means exempt himself from this section or from section one hundred and fifty." § 149. Stanton argues that based on the clear purpose and text of the statute, his agreement to defer payment upon the board's decision is void as a matter of law. I agree.[8]

The cases on point, all at the state superior court level, are in tension. *Sword v.*

---

8. If any deferral agreement violates the Wage Act, then Stanton must prevail on his Wage Act claim (as to liability, at least) regardless of what action the board actually took. Therefore, this is an appropriate issue for summary judgment.

*Biofertec, Ltd. ("Sword II")*, No. 01–4247, 2003 WL 21246200 (Mass.Super.Ct. Mar. 31, 2003), involved a plaintiff who joined a startup company, which developed in vitro fertilization technology, at a salary of $125,000. Before taking the job, he was told numerous times that "any salary which Biofertec would pay him would be contingent on the raising of sufficient capital" and that "salary payments were contingent upon sufficient funding." *Id.* at *1. His employment agreement stated that he would be paid his base salary "as soon as is practical," a phrase the court found referred to the state of the company's finances. *Id.* at *2. Six months later, the plaintiff left the company and demanded roughly $29,000 in unpaid salary (the company had paid him $37,000, significantly more than it had paid its three principals). After a bench trial, the court ruled against the plaintiff on his Wage Act claim because he had clearly understood the contingency arrangement and yet failed to prove that the company ever had sufficient funds to pay him. *Id.* at *5. In so ruling, the court implicitly held that a deferral contract is not per se a violation of the Wage Act.

In *Kalra v. Viking Networks, Inc.*, No. 02–2171, 2005 WL 503723 (Mass.Super.Ct. Jan. 21, 2005), a company's former chief technical officer sued its president and chairman for $100,000 in unpaid salary under the Wage Act. When the plaintiff was being recruited, he had received an email stating, "[t]he hope is that we will raise money soon and can pay you a real salary, but of course it's a question mark." When he was fired seventeen months later, he had not been paid at all. The court denied the defendant's motion for partial summary judgment based on the existence of genuine issues of material fact as to whether the plaintiff understood the contingent nature of his salary. *Id.* at *4. Citing *Sword II*, the court assumed that such deferral agreements were valid.

A third case, *Dobin v. CIOview Corp.*, No. 01–00108, 2003 WL 22454602 (Mass.Super. Oct. 29, 2003), came out precisely the opposite way. There, a manager in a startup had been paid for five straight months until the company reached a financial crisis. Rather than file for bankruptcy, the company's employees, including the plaintiff and her supervisors, agreed to "defer[ ] any salary payments until business improved and the corporation could afford to pay them" and that salaries would be the outlay made after rent and utilities. Later that year, the plaintiff grew anxious about her deferred salary and brought suit under the Wage Act. The court held that the deferral agreement violated the statute's prohibition on special contracts circumventing the Act.

For several reasons, *Dobin* seems a better statement of the law than *Sword II* or Kalra. Neither *Sword II* nor *Kalra* analyzed the deferral agreement in light of the statutory provision prohibiting special contracts. *Sword II* did not even hint at its existence, and Kalra mentioned it without analysis. Both cases assumed the validity of deferral agreements and focused on different questions—in *Sword II*, whether the profitability trigger for payment had been met, and in Kalra, whether the parties had in fact agreed to the deferral. *Dobin*, by contrast, rested its holding on the textual meaning and purpose of the special contracts provision:

> The provision is unconditional; it sets forth no circumstance in which such a waiver would be lawful. . . . Here, the words used in the statute are clear, as is the legislature['s] purpose—to prevent the unreasonable detention of wages. . . . Viewing the words used in this provision in light of the statute's legislative purpose, it is plain that the Legislature intended to bar any contract

between an employer and employee that denied the employee the prompt payment of wages guaranteed by the Wage Act. The oral deferral agreement entered into between [the defendant company] and [the plaintiff] was precisely such a prohibited agreement because it would have permitted [the company] to postpone paying [the plaintiff] her monthly wages well beyond the six days provided under the Act.

*Id.* at *5. Notably, the decision in *Kalra* was issued fifteen months after *Dobin* and yet did not address its thoughtful analysis at all.

Moreover, a recent decision of the Massachusetts appeals court supports *Dobin's* textualist and coverage-expanding approach. In *Okerman,* in which the appeals court vacated the dismissal of the plaintiff's Wage Act claims on the grounds that his commissions were sufficiently definite to qualify as wages, the court rejected the judicial narrowing of the Act's coverage based on policy concerns: "One can imagine sound public policy reasons to support the restrictions that have been read into the wage act and employed below. However, whether, as a matter of public policy, the application of the wage act should be so limited is better left to the elected members of our Legislature." 69 Mass. App.Ct. at 780 n. 11, 871 N.E.2d 1117 (2007). This sentiment echoes the *Dobin* court's reluctance to carve an exception out of the Wage Act for startups.[9]

Following *Dobin,* I find that the deferral agreement in Stanton's employment con-

tract is void as a matter of law. Stanton is an employee and his salary amounts to wages under the Act. Notwithstanding any future startup-protecting revisions by the legislature, the plain text of the statute prohibits attempts to avoid the payment obligation. As the parties do not dispute that Stanton was never paid for his work at Lighthouse, I **GRANT** summary judgment to Stanton on his Wage Act claim as to liability.

## V. MOTION TO AMEND

■ On July 22, 2008, the defendants moved to amend their answer, originally filed on April 20, 2006, to assert two additional affirmative defenses: (1) a claim for set-off on Drunsic's part, and (2) the defense of in pari delicto. A court should freely give leave to amend "when justice so requires." Fed.R.Civ.P. 15(a)(2). However, a court should deny leave when amendment would be futile or would reward undue delay, bad faith, or dilatory motive. *States Resources Corp. v. Architectural Team, Inc.,* 433 F.3d 73 (1st Cir.2005); *Wigfall v. Duval,* No. 00–12274, 2006 WL 2381285, at *1 (D.Mass. Aug. 15, 2006). Stanton opposes both amendments as futile and unduly delayed.

### A. *Set-off of Mutual Claims*

■ Drunsic seeks to assert a set-off defense based on his and Stanton's "mutual claims" under the Wage Act. Mot. to Amend at 2 (document # 39). Stanton objects that Drunsic has asserted no Wage Act claim in this case and that the applica-

---

**9.** The court wrote, "[t]his Court recognizes that enforcing this provision in the Wage Act may adversely affect those start-up companies which ask employees to for[go] wages until the company reaches financial viability. This Court does not offer any opinion as to whether the Wage Act is wise in prohibiting deferral agreements in all circumstances, or whether there are ways in which start-ups can avoid this prohibition by paying employees only the minimum wage and offering bonuses that are conditioned on the company's financial performance. The fact of the matter is that the language of the Wage Act is crystal clear on this point, and, unless and until the Act is amended, this Court is obligated to enforce its clear mandate." *Dobin,* 2003 WL 22454602, at *6.

ble statute of limitations has now run. I agree. While Drunsic may have been able to state a claim against Stanton under the Wage Act—on the logic that Stanton is himself an employer under the statute and Drunsic might be an employee—he elected not to include this among his counterclaims. In fact, to raise such a claim, he first would have had to file his complaint with the Massachusetts Attorney General and then bring suit within three years of the alleged violation. Mass. Gen. Laws ch. 149, § 150. Stanton left Lighthouse in June 2004, and the company filed for bankruptcy in January 2005. The statute has long since run. There can be no set-off claim now, and any attempt to assert this defense would be futile.

### B. *In Pari Delicto*

 In pari delicto doctrine is the "principle that a plaintiff who has participated in wrongdoing may not recover damages resulting from the wrongdoing." *Black's Law Dictionary* 807 (8th ed. 2004). The theory underlying the doctrine is that "courts will not lend aid to parties who base their cause of action on their own immoral or illegal acts." *Choquette v. Isacoff*, 65 Mass.App.Ct. 1, 4, 836 N.E.2d 329 (2005). In the instant case, I find that the defense of in pari delicto cannot be raised by an employer subject to a claim for violation of the Wage Act.

As an initial matter, I note that this case does not involve quite the same level of moral turpitude as many in which courts have applied the doctrine. *See, e.g., Lyons v. Elston*, 211 Mass. 478, 98 N.E. 93 (1912) (in suit over which siblings would get the deed to their mother's house, neither plaintiff-sister nor defendant could recover where they had procured the deed by undue influence to exclude plaintiff-brother); *AGM Marine Contractors, Inc. v. Canby, Maloney & Co., Inc.*, No. 07–P–616, 2008 WL 1700120 (Mass.App.Ct. Apr. 14, 2008) (granting summary judgment against plaintiff who sued accounting firm for failure to prepare his tax returns properly, leading to his conviction of tax crimes, on the basis that the plaintiff was fully engaged in the wrongdoing). Nonetheless, courts have applied the doctrine to suits arising out of contracts that are void under state law. In *Arcidi v. Nat'l Ass'n of Gov't Employees, Inc.*, 447 Mass. 616, 856 N.E.2d 167 (2006), a union agreed to pay a consultant $250,000 for securing government approval of a proposed development project. After securing the approval but failing to receive full compensation, the consultant sued the union for breach of contract. The court applied the doctrine of in pari delicto to bar the suit, as the contract violated a state statute prohibiting contracts that made compensation contingent on a government decision. *Id.* at 616–17, 620, 856 N.E.2d 167.

 In the instant case, the deferral agreement violated the Wage Act, and as to that, Stanton and Drunsic appear to stand in equal fault: they voluntarily entered into identical agreements to defer compensation, each signing the other's contract as a representative of the corporation. While under the general rule, the doctrine of in pari delicto would bar Stanton's recovery under the Act, a clear exception to the doctrine applies here. Courts grant equitable relief to a party to an illegal contract "where the provision of law rendering the contract illegal was clearly intended to benefit one party over the other, i.e., the public policy is intended to protect persons of the class to which one party belongs." *Arcidi*, 447 Mass. at 621, 856 N.E.2d 167. In *Council v. Cohen*, 303 Mass. 348, 21 N.E.2d 967 (1939), for example, the court held that a second mortgage was invalid as prohibited by the Home Owner's Loan Act, but nonetheless allowed

the plaintiff to recover interest paid on the mortgage because the act's "intent is to aid the home owner and not the mortgagee." *Id.* at 355, 21 N.E.2d 967. The court held that this public policy exception was "as widely recognized and thoroughly established as is the rule itself." *Id.* at 354, 21 N.E.2d 967.

It is appropriate here, as well. The Wage Act by its plain terms aims to protect employees by preventing the detention of wages. *See Am. Mut. Liab. Ins. Co.*, 340 Mass. at 147, 163 N.E.2d 19. If that protective purpose is to be vindicated, even employees who agree to deferral of wages must be allowed to recover against their employers. Accordingly, I hold that an exception to the in pari delicto doctrine applies, and it would be futile to allow amendment on this ground. The defendants' motion to amend is **DENIED**.

## VI. CONCLUSION

Stanton's Motion for Reconsideration (document # 38) is hereby ***GRANTED,*** and Defendants' Motion for Reconsideration (document # 42) is ***DENIED.*** Defendants' Motion to Amend Answer (document # 39) is also ***DENIED.*** This case will now proceed to trial on Stanton's claims under breach of contract and breach of fiduciary duty; what measure of punitive damages, if any, he should get under the Wage Act; and the defendants' counterclaims for breach of fiduciary duty and violation of Chapter 93A.

**SO ORDERED.**