**Charles M. DOUCOT, Plaintiff,**

v.

**IDS SCHEER, INC. and IDS Scheer Americas, Inc., Defendants.**

**Civil Action No. 09–11482–MBB.**

United States District Court, D. Massachusetts.

Aug. 10, 2010.

Rachel E. Brodin, Goulston & Storrs, PC, Boston, MA, for Plaintiff.

Roger A. Lane, Courtney Worcester, Katherine B. Hollingsworth, Pepper Hamilton LLP, Boston, MA, for Defendants.

***MEMORANDUM AND ORDER RE: MOTION TO DISMISS PLAINTIFF'S SECOND AMENDED COMPLAINT (DOCKET ENTRY # 30); MOTION TO DISMISS PLAINTIFF CHARLES DOUCOT'S SECOND AMENDED COMPLAINT (PARTIAL MTD) (DOCKET ENTRY # 33)***

BOWLER, United States Magistrate Judge.

Pending before this court are two motions to dismiss the second amended complaint (Docket Entry # # 30 & 33) filed by defendants IDS Scheer, Inc. ("IDS") and IDS Scheer Americas, Inc. ("IDS Americas") (collectively: "defendants"). Plaintiff Charles M. Doucot ("plaintiff") brings three claims for breach of contract, one claim for attorney's fees and one claim under Massachusetts General Laws chapter 149, section 148 ("MA Wage Act" or "section 148"). (Docket Entry # 28, Ex. A). Defendants move to dismiss various claims under Rule 12(b)(6), Fed.R.Civ.P. ("Rule 12(b)(6)"), for failure to state a claim upon which relief may be granted and Rule 12(b)(1), Fed.R.Civ.P. ("Rule 12(b)(1)"), for lack of subject matter jurisdiction. (Docket Entry # # 30 & 33).

## PROCEDURAL BACKGROUND

Plaintiff filed the complaint on September 8, 2009. (Docket Entry # 1). The original claims included two counts for breach of contract and one count for attorney's fees. (Docket Entry # 1). Subsequently, on September 10, 2009, plaintiff filed the first amended complaint which added a count under the MA Wage Act. (Docket Entry # 6).

Defendants filed a motion to dismiss the first amended complaint on October 5, 2009. (Docket Entry # 13). On October 19, 2009, plaintiff filed an opposition to the motion to dismiss the first amended complaint. (Docket Entry # 19). On November 11, 2009, defendants filed a motion for leave to file a "Reply Brief in Support of Motion to Dismiss" with the proposed reply brief attached. (Docket Entry # 24). Plaintiff opposed that motion on November 19, 2009. (Docket Entry # 26).

On November 30, 2009, this court heard argument on the motion to dismiss the first amended complaint. This court took the motion (Docket Entry # 13) under advisement and also allowed plaintiff leave to file an amendment to the first amended complaint. On December 15, 2009, plain-

tiff filed a motion to amend the first amended complaint with the second amended complaint attached as exhibit A. (Docket Entry # 28). On December 29, 2009, defendants filed a motion to dismiss the second amended complaint. (Docket Entry # 30).[1] On January 11, 2010, plaintiff filed an opposition to the motion to dismiss the second amended complaint. (Docket Entry # 31).

In open court on April 1, 2010, this court allowed the motion to amend the first amended complaint (Docket Entry # 28) and allowed defendants leave to file the reply brief (Docket Entry # 24). Defendants agreed to withdraw the motion to dismiss the first amended complaint. (Docket Entry # 13). On April 15, 2010, defendants filed "a new motion to dismiss [addressing] all of the claims in the [second amended complaint]" ("partial motion to dismiss"). (Docket Entry # 33).[2] Also on April 15, 2010, defendants filed an answer to the second amended complaint.

(Docket Entry # 37). On April 28, 2010, plaintiff filed an opposition to the partial motion to dismiss. (Docket Entry # 38).

## FACTUAL BACKGROUND [3]

Plaintiff is an individual residing in Rowley, Massachusetts. (Docket Entry # 28, Ex. A). Defendants, wholly owned subsidiaries of the German corporation IDS Scheer AG ("IDS AG"), have a principal place of business in Berwyn, Pennsylvania. (Docket Entry # 28, Ex. A).

On September 16, 2003, a certificate of amendment of IDS was filed with the Delaware Secretary of State's office changing IDS's name to "IDS Scheer Business Process Management, Inc." ("IDS BPM"). (Docket Entry # 15, Ex. A). Subsequently, IDS BPM merged with four other entities under the name of "IDS Scheer Americas, Inc.," as evidenced by a certificate filed with the State of Delaware on October 31, 2006. (Docket Entry # 15, Ex. B).

---

1. Plaintiff raised two procedural arguments in opposition to defendants' motion to dismiss (Docket Entry # 31). First, plaintiff maintains that the motion to dismiss (Docket Entry # 30) fails to comply with Local Rule 7.1(b)(1) requiring defendants to file a memorandum of reasons in conjunction with the motion. (Docket Entry # 31). Defendants filed the motion and the supporting arguments in the same document. "A district court possesses great leeway in the application and enforcement of its local rules." *U.S. v. Roberts*, 978 F.2d 17, 20 (1st Cir.1992). Because the requirement of Local Rule 7.1(b)(1) is not jurisdictional and defendants have since filed a subsequent motion to dismiss in compliance with the rule, any noncompliance is harmless and does not warrant a denial of the motion.

Second, plaintiff contends that the motion to dismiss "is improperly styled as a motion to dismiss the Second Amended Complaint, rather than an opposition to Plaintiff's Motion to Amended the Complaint." (Docket Entry # 31). This court's allowance of the motion to amend the first amended complaint with the second amended complaint moots the argument.

2. Defendants filed a memorandum in support (Docket Entry # 34) along with the partial motion to dismiss (Docket Entry # 33).

3. This court will consider the pleadings and various affidavits filed by both parties for purposes of the Rule 12(b)(1) analysis, but will not consider materials outside the pleadings in its Rule 12(b)(6) analysis. See *Id.* ("the court generally may not consider materials outside the pleadings on a Rule 12(b)(6) motion, [but] it may consider such materials on a Rule 12(b)(1) motion"); *see also Farley v. Shaw's Supermarkets, Inc.*, 497 F.Supp.2d 23, 25 (D.Mass.2007) ("[i]n resolving any factual disputes regarding the existence of jurisdiction, a court may review any evidence, including any submitted affidavits and depositions") (citing *Aversa v. United States*, 99 F.3d 1200, 1210 (1st Cir.1996)); *White v. Commissioner of Internal Revenue*, 899 F.Supp. 767, 771 (D.Mass.1995) ("[t]he Court can look beyond the pleadings-to affidavits and depositions-in order to determine jurisdiction.").

In October of 2006, "defendants contacted [plaintiff] to discuss his interest in the position of 'Senior Vice President and General Manager Product Business Americas.'" (Docket Entry # 28, Ex. A). The "parties" negotiated the terms of an executive employment agreement ("the Agreement") via telephone and electronic mail while plaintiff resided in Massachusetts. (Docket Entry # 28, Ex. A). On October 27, 2006, plaintiff executed the Agreement. (Docket Entry # 28, Ex. A). The Agreement was between plaintiff and "IDS Scheer, Inc." (Docket Entry # 28, Ex. 1). The Agreement has a heading that reads, "IDS SCHEER AMERICAS." (Docket Entry # 28, Ex. 1).

Section four of the Agreement sets out five forms of compensation to plaintiff: "(1) Base Salary, (2) Bonus Compensation, (3) Fringe Benefits, (4) Reimbursement of Expenses, and (5) Sign-on Bonus." (Docket Entry # 28, Ex. A & Ex. 1). At the time of plaintiff's termination, he had an "annual salary of $315,000." (Docket Entry # 28, Ex. A & Ex. 1). The "Bonus Compensation . . . as more particularly described in Exhibit B" consisted of a "Plan Bonus" and a "Retention Plan 2010" bonus. (Docket Entry # 28, Ex. 1). According to the Agreement, "All bonuses . . . shall be withheld and paid in accordance with the Company's normal payroll practice for its similarly situated employees." (Docket Entry # 28, Ex. 1).

The Agreement contained an employment term "commencing on 01st December 2006, subject to the provision of Section 7." (Docket Entry # 28, Ex. 1). Section seven on "Early Termination" addressed "Termination Without Cause" in subsection (d). (Docket Entry # 28, Ex. A & Ex. 1). "The Company" had the right to "terminate the Executive's employment under [the] Agreement at any time for any reason or no reason by giv-

ing the Executive fourteen (14) days prior written notice of such termination." (Docket Entry # 28, Ex. 1, § 7(d)). In the event of a termination without cause, subsection 7(d) dictated that:

(i) the Executive shall be entitled to receive all *earned* but unpaid (*as of the effective date of such termination)* Base Salary, pro-rated bonuses under Section 4(b), fringe benefits under Section 4(c) and business expense reimbursements under Section 4(d); and

(ii) the Company shall continue to compensate the Executive under Sections 4(a) and 4(c) (subject to the terms of any benefit or compensation plan then in force and applicable to the Executive) for six (6) months following such termination.

(Docket Entry # 28, Ex. 1, § 7(d)) (emphasis added).

As stated in the complaint, on May 18, 2009, "newly appointed Chief Executive Officer of IDS Scheer, Inc.," Joerg Heisterman, and "Regional Human Resources Director of IDS Scheer, Inc., Amy Goldberg" ("Goldberg"), informed plaintiff of his termination "ostensibly because Defendants were eliminating his position." (Docket Entry # 28, Ex. A). Plaintiff's employment terminated on June 1, 2009. (Docket Entry # 28, Ex. A).

In accordance with subsection 7(d)(ii), plaintiff's severance period ran from June 1, 2009 to December 1, 2009. (Docket Entry # 28, Ex. A). According to plaintiff, under the terms of "the vacation program generally available to officers of the Company," plaintiff was "entitled to two and a half weeks of vacation" during the six month severance period. (Docket Entry # 28, Ex. A). Defendants have not "provide[d] any pay-out to [plaintiff] for his vacation days during his six-month severance period." (Docket Entry # 28, Ex. A). The amount of "a pay-out of his vacation

days based on his annual salary of $315,000 [would be] $15,144.23." (Docket Entry # 28, Ex. A).

When the complaint was filed, defendants had not provided plaintiff with a calculation or payment of any amount under the "Bonus Plan." (Docket Entry # 28, Ex. A). According to plaintiff, the "amount exceeds $200,000." (Docket Entry # 28, Ex. A). "As of the date of [his] termination, [he] had earned ... at least $21,000 (prorated for the portion of the year that [he] was employed) under the 2009 Plan Bonus." (Docket Entry # 20).[4]

Additionally, defendants "have not paid him for achieving one of the milestones listed in the Retention Plan 2010 bonus scheme." (Docket Entry # 28, Ex. A). Under the Agreement "the Company" would pay plaintiff "an additional and maximum bonus of $500,000 ... provided that IDS Scheer AG meets the [listed] performance goals in 2010." (Docket Entry # 28, Ex. 1, § 4(b) & Ex. B). In no uncertain terms, exhibit B to the Agreement, states that plaintiff begins to earn that bonus "when more than 70% of the goal has been met." (Docket Entry # 28, Ex. 1, Ex. B). One of the goals is to "Grow [IDS AG] corporate revenue Euro 350k in 2010 over 2006 revenue" and is allocated 30% of the maximum $500,000 bonus. (Docket Entry # 28, Ex. 1, Ex. B). According to plaintiff, "Defendants achieved this goal in 2007 by increasing IDS Scheer, Inc.'s revenue by 39.5 million in 2007." (Docket Entry # 28, Ex. A).

Another of the goals, which is allocated 30% of the total Retention Plan 2010 bonus, is to "achieve 14% EBITA for overall corporation in 2010." (Docket Entry # 28, Ex. A). The last goal, allocated 40% of the bonus, requires IDS "Americas to be 45% of worldwide product revenues (new license, ARIS consulting and software-maintenance revenue) by 2010." (Docket Entry # 28, Ex. A & Ex. 1, § 4(b) & Ex. B).

Goldberg avers that, "If annual bonuses are based upon the performance of IDS or a division or affiliate thereof, those bonuses are traditionally paid to employees by the end of the first quarter following the close of the prior calendar year." (Docket Entry # 14). Furthermore, Goldberg assured, "If, after the close of calendar year 2009, it is determined that Mr. Doucot is eligible for a bonus, such bonus would be calculated pursuant to the terms of his Executive Employment Agreement and he would be paid his prorated bonus in the ordinary course in the first quarter of 2010." (Docket Entry # 14).

On May 20, 2009, plaintiff sent Goldberg an e-mail regarding the "amounts owed to [him] by IDS." (Docket Entry # 20). Goldberg responded on May 21, 2009, that "IDS Scheer determined that the bonus under [the Retention Plan 2010] was not earned as of [his] termination and therefore was not payable."[5] (Docket Entry # 20). On May 26, Goldberg e-mailed plaintiff "stating that the calculation of [his] 2009 bonus would be completed in June" but it "was never provided to [him]." (Docket Entry # 20).

On March 12, 2010, plaintiff "received a bonus check from IDS Scheer in the pretax amount of $58,041.67 ... for [the] bonus payment for the year ending 2009." (Docket Entry # 38, Ex. A). On March

---

4. That plaintiff claims he earned "at least $21,000" is considered only as a part of the amount in controversy analysis. *See Spielman v. Genzyme Corp.*, 251 F.3d 1, 5 (1st Cir.2001).

5. As previously noted, subsection 7(d)(I) provides that where, as here, the executive is terminated without cause, he is entitled to "all earned by unpaid ... pro-rated bonuses." (Docket Entry # 28, Ex. 1, § 7(d)(i)).

18, 2010, Amy Goldberg responded to plaintiff's "request for information regarding the calculation and metrics of [his] 2009 bonus" by stating, "[I]t would be appropriate for this information to be addressed within the course of the litigation." (Docket Entry # 38, Ex. A). As of March 25, 2010, "the Software AG Group [held] more than 91 percent of the equity shares of IDS Scheer AG." (Docket Entry # 32).

## STANDARD OF REVIEW

■ For purposes of the motions to dismiss the second amended complaint (Docket Entry ## 30 & 33) filed under Rule 12(b)(1) and Rule 12(b)(6), this court takes "all factual allegations in the complaint as true." *Maldonado v. Fontanes,* 568 F.3d 263, 266 (1st Cir.2009) (quoting *Ashcroft v. Iqbal,* —— U.S. ——, 129 S.Ct. 1937, 1949–50, 173 L.Ed.2d 868 (2009)). This court "need not accept as true legal conclusions from the complaint or " 'naked assertion[s]' " devoid of "further factual enhancement." ' " *Id.* (quoting *Bell Atlantic Corp. v. Twombly,* 550 U.S. 544, 557, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007)). This court notes that "Solely for the purposes of this Motion to Dismiss do the Defendants accept the well-pleaded factual allegations in the [second amended complaint]." (Docket Entry # 17, p. 1, n. 1).

■ Under Rules 12(b)(1) and Rule 12(b)(6), this court may consider the well pleaded factual allegations in the second amended complaint (Docket Entry # 28, Ex. A) as well as the Agreement attached thereto (Docket Entry # 28, Ex. 1) without converting the motion into one for summary judgment. *See Trans–Spec Truck Service, Inc. v. Caterpillar, Inc.,* 524 F.3d 315, 321 (1st Cir.2008) ("[e]xhibits attached to the complaint are properly considered part of the pleading 'for all purposes,' including Rule 12(b)(6) motions"); *Gonzalez v. United States,* 284 F.3d 281, 288 (1st Cir.2002) ("attachment of exhibits to a Rule 12(b)(1) motion does not convert it to a Rule 56 motion"). As previously addressed, this court will consider the pleadings and various affidavits filed by both parties for purposes of the Rule 12(b)(1) analysis, but will not consider materials outside the pleadings in its Rule 12(b)(6) analysis. *See Id.; see also White v. Commissioner of Internal Revenue,* 899 F.Supp. at 771.

## DISCUSSION

Defendants' partial motion to dismiss (Docket Entry # 33) elaborates on the arguments made in the earlier motion to dismiss (Docket Entry # 30), except in one respect. The earlier motion argues that, "Plaintiff has not made a good faith representation of the actual amount in controversy." (Docket Entry # 30). Accordingly, this court examines the earlier motion to dismiss (Docket Entry # 30) for purposes of the amount in controversy arguments and the partial motion to dismiss (Docket Entry # 33) when deciding the failure to state a claim and ripeness arguments.

Defendants attack the claims with four main arguments: (1) plaintiff has not made a good faith representation of the amount in controversy for diversity jurisdiction under 28 U.S.C. § 1332(a) (Docket Entry # 30); (2) dismissal of all claims against IDS is proper because "it no longer exists as an entity" (Docket Entry # 33); (3) with respect to IDS Americas, counts II, IV and part of V fail to state "any cognizable claim" upon which relief may be granted under Rule 12(b)(6) (Docket Entry # 33); and (4) also with respect to IDS Americas, counts II, IV and part of V are not ripe for adjudication and thus this court lacks subject matter jurisdiction over them pursuant to Rule 12(b)(1) (Docket

Entry # 33). This court addresses these four overarching arguments in turn.

## I. *Amount in Controversy*

Defendants argue that diversity jurisdiction does not attach in this matter because plaintiff has not made a good faith representation of the actual amount in controversy. (Docket Entry # 30). They contend plaintiff cannot meet the $75,000 requirement because the causes of action: (1) "are not ripe for adjudication"; (2) "seek damages that are based upon a misrepresentation of the plain language of the Agreement regarding a 2010 bonus"; (3) "seek damages for the non-existent claim for attorney's fees"; and (4) "seek damages under The Wage Act that are not recoverable as a matter of law." (Docket Entry # 30). "If [a federal] court determines at any time that it lacks subject-matter jurisdiction, the court must dismiss the action." Fed.R.Civ.P., Rule 12(h)(3).

■ For a district court to have original diversity jurisdiction over a civil action the amount in controversy must exceed the sum or value of $75,000. *See* 28 U.S.C. § 1332(a). "[T]he amount specified by the plaintiff controls, as long as that amount is asserted in good faith." *Barrett v. Lombardi,* 239 F.3d 23, 30 (1st Cir.2001); *see St. Paul Mercury Indemnity Co. v. Red Cab Co.,* 303 U.S. 283, 58 S.Ct. 586, 82 L.Ed. 845 (1938) (focusing primarily upon the plaintiff's "good faith" in alleging the amount in controversy); *Amoche v. Guarantee Trust Life Insurance Company,* 556 F.3d 41, 49, n. 3 (1st Cir.2009); *Coventry Sewage Associates v. Dworkin Realty Co.,* 71 F.3d 1, 4 (1st Cir.1995).

"Once the damages allegation is challenged ... 'the party seeking to invoke jurisdiction has the burden of alleging with sufficient particularity facts indicating that it is not a legal certainty that the claim involves less than the jurisdictional amount.'" *Spielman v. Genzyme Corp.,* 251 F.3d 1, 5 (1st Cir.2001). Along with plaintiff's opposition to defendants' motion to dismiss the first amended complaint, plaintiff also filed an affidavit (Docket Entry # 20) [6] detailing how and why he calculated the amounts claimed in the first amended complaint. Plaintiff attached as exhibits to the affidavit the Agreement and IDS AG's 2007 Annual Report ("the 2007 Report"). (Docket Entry # 20, Ex. 1 & 2).

■ "For the purpose of establishing diversity jurisdiction, the amount in controversy is determined by looking to the circumstances at the time the complaint is filed." *Coventry Sewage Associates v. Dworkin Realty Co.,* 71 F.3d at 4. In the first amended complaint, filed on September 10, 2009, plaintiff alleged that, "Defendants have failed to remit payment for his earned but unpaid 2009 compensation bonus under the Agreement's Plan Bonus," which "[o]n information and belief ... exceeds $200,000" and further that, "[P]ursuant to the formula stated in the Retention Plan, Mr. Doucot is owed approximately $350,000." (Docket Entry # 6). On its face, then, "these causes of action have the collective potential to reap a harvest well in excess of $75,000." *Corrada Betances v. Sea–Land Service, Inc.,* 248 F.3d 40, 45 (1st Cir.2001).

■ Three situations where the legal certainty standard defeats subject matter jurisdiction include: "1) when the terms of a contract limit the plaintiff's possible recovery; 2) when a specific rule of substan-

---

6. *Spielman v. Genzyme Corp.,* 251 F.3d 1, 5 (1st Cir.2001) ("[a] party may meet this burden [of alleging with sufficient particularity facts indicating that it is not a legal certainty that the claim involves less than the jurisdictional amount] by amending the pleadings or by submitting affidavits").

tive law or measure of damages limits the amount of money recoverable by the plaintiff; and 3) when independent facts show that the amount of damages was claimed by the plaintiff merely to obtain federal court jurisdiction." *See Westinghouse Electric Co., LLC v. Healy,* 502 F.Supp.2d 138, 141, n. 4 (D.Me.2007) (citing 14B Charles Wright, Arthur Miller & Edward Cooper, *Federal Practice and Procedure* § 3702, at 98–101 (1998)). The Agreement by its terms does not limit the amount recoverable under the Bonus Plan or the Retention Plan to less then $75,000. Furthermore, no rule of law or measure of damages applies to this situation limiting the amount recoverable to less than $75,000. Finally, nothing in the record suggests plaintiff claimed the amount of damages merely to obtain federal jurisdiction and defendants do not so argue.

■ Regarding plaintiff's 2009 Plan Bonus, he attests, "My goals for the annual Plan Bonus were negotiated each year [and] I earned bonus amounts, in part, upon achievement of 70% of the relevant goal and, in full, upon achievement of more than 130% of the relevant goal." (Docket Entry # 20). According to the "Annual Bonus Payment 2009–Charles Doucot" Table (Docket Entry # 20, Ex. 1) at 100% achievement plaintiff would receive $210,000. (Docket Entry # 20, Ex. 1). If, for instance, plaintiff met 100% of the two revenue goals, "Revenue ARIS Region North America" and "Revenue Consulting Region North America," prior to his termination, he could have earned $63,000 and $42,000 respectively. At the time plaintiff filed the complaint, "Defendants [had] failed to provide Mr. Doucot with either the calculation or the bonus, itself." (Docket Entry # 6). Taking into consideration that plaintiff's employment was terminated after six months in 2009, the evidence before this court does not show "to a

legal certainty, that the damages never could have exceeded the jurisdictional minimum *such that* the claim was essentially feigned (colorable) in order to confer jurisdiction." *Coventry Sewage Associates v. Dworkin Realty Co.,* 71 F.3d at 6 (emphasis in original).

■ This court notes that during the pendency of this matter plaintiff "received a bonus check from IDS Scheer in the pretax amount of $58,041.67." (Docket Entry # 38, Ex. A). While this amount is clearly below the $75,000 threshold, and may reduce any potential recovery, this circuit holds that "if events subsequent to commencement of the action reduce the amount in controversy below the statutory minimum, [a] federal court is not divested of jurisdiction." *Id.*

Based on the foregoing, at the time the claims were filed, *see Stewart v. Tupperware Corporation,* 356 F.3d 335, 338 (1st Cir.2004), plaintiff demonstrated that it was not apparent to a legal certainty that the claims involved less than $75,000. This court therefore need not analyze the challenges to the good faith of the amounts claimed for the Retention Plan 2010, vacation pay, attorney's fees or Wage Act counts. Accordingly, the motion to dismiss argument regarding amount in controversy lacks merit.

## II. *IDS's Existence for Litigation*

■ Defendants move to dismiss all claims against IDS because that entity "no longer exists." (Docket Entry # 33). A corporation's capacity to sue or be sued is determined by the law of the state under which it was organized. *See* Rule 17(b)(2), Fed.R.Civ.P. The parties agree, and the evidence in the record demonstrates, that IDS was organized in Delaware. (Docket Entry # # 19 & 34). Therefore, Delaware

law applies for determining IDS's capacity to be sued.[7]

Defendants filed an affidavit of their counsel, Courtney Worcester, supporting the partial motion to dismiss. (Docket Entry # 35). It attests to two exhibits: (1) a "Certificate of Amendment of IDS Scheer, Inc., changing its name from 'IDS Scheer, Inc.' to 'IDS Scheer Business Process Management, Inc.'" ("certificate of amendment"); and (2) a "Certificate of Merger for the merger of IDS Scheer Business Process Management, Inc . . . . with and into IDS Scheer Americas, Inc. under the name 'IDS Scheer Americas, Inc.'" ("certificate of merger"). (Docket Entry # 35). The attached exhibits include both the certificates and copies of certifications by the Secretary of State for the State of Delaware, Harriet Smith Windsor, attesting to their accuracy. (Docket Entry # 35, Ex. A & B). This evidence demonstrates that on or before September 16, 2003, the date when the certificate of amendment was filed, IDS changed its name to "IDS Scheer Business Process Management, Inc." (Docket Entry # 35, Ex. A). It further shows that on or before October 31, 2003, the date when the certificate of merger was filed, IDS Scheer Business Process Management, Inc. merged with and into IDS Scheer Americas, Inc. (Docket Entry # 35, Ex. B).[8]

Title 8, Section 259 of the Delaware Code ("section 259") describes the status, rights and liabilities of constituent and surviving corporations following a merger or a consolidation. *See* 8 Del.C. § 259. It states in pertinent part:

> When any merger or consolidation shall have become effective under this chapter, for all purposes of the laws of this State the separate existence of . . . all such constituent corporations except the one into which the other or others of such constituent corporations have been merged . . . *shall cease* and the constituent corporations shall . . . be merged into 1 of such corporations . . . and all debts, liabilities and duties of the respective constituent corporations shall thenceforth attach to said surviving or resulting corporation, and may be enforced against it to the same extent as if said debts, liabilities and duties had been incurred or contracted by it.

8 Del.C. § 259 (emphasis added).

"When a consolidation or merger has taken place under the statute, the old corporations have their identity absorbed into that of . . . the one into which they were merged." *Argenbright v. Phoenix Finance Co. of Iowa,* 187 A. 124, 126 (Del. Ch.1936). The Court of Chancery of Delaware in *Beals* granted a defendant's mo-

---

7. Plaintiff cites the First Circuit case, *Shanahan,* for the proposition that, "even though dissolved the plaintiff corporation still exists as a legal entity for the purposes of this case." *Shanahan v. George B. Landers Construction Company, Inc.,* 266 F.2d 400, 407 n. 1 (1st Cir.1959). Even putting aside the fact that *Shanahan* was not decided based on Delaware law, this case is nonetheless distinguishable from *Shanahan* first because in *Shanahan* the "plaintiff-appellee's brief . . . *incidentally* asserted that the plaintiff corporation is 'now dissolved.'" *Id.* (emphasis added). Here, defendants expressly argue that under Delaware law IDS no longer exists. Second, and more importantly, the court in

*Shanahan* noted that, "there [was] nothing in the record to support the statement" that plaintiff was dissolved. *Id.* Here, defendants submitted copies, with a supporting affidavit, of the certificates of amendment and merger, demonstrating the dissolution of IDS. (Docket Entry # 12, Ex. A & B).

8. While this court may look to affidavits when considering a motion under Rule 12(b)(6), under *In re Mailman Steam Carpet Cleaning Corp.,* 196 F.3d 1, 6 n. 2 (1st Cir.1999), this court may also take judicial notice of information in the public record to which there is no objection as to its authenticity.

tion to quash the service of process on a constituent, or non-surviving, entity. *See Beals v. Washington International, Inc.,* 386 A.2d 1156 (Del.Ch.1978). The court stated, "Since [the moving defendant] is the corporation into which [the other entity] was merged, it is liable for all the debts, liabilities and duties of [that other entity]." *Id.* at 1160. The court reasoned, "[I]t should be kept in mind that corporations exist only by legislative act. [Since] by statute, corporate existence is terminated on the date of merger ... a corporation ceases to exist on merger for all purposes, including service of process, unless the legislature provides otherwise." *Id.* at 1161.

Plaintiff relies on Title 8, section 278 of the Delaware Code ("section 278") for the proposition that:

> [a]ll corporations, whether they expire by their own limitation or are otherwise dissolved, shall nevertheless be continued, for the term of 3 years from such expiration or dissolution or for such longer period as the Court of Chancery shall in its discretion direct ... for the purpose of prosecuting and defending suits.

8 Del.C. § 278. Section 278 does not apply here for the following reasons.

Under Delaware common law, "the dissolution of a corporation terminated its existence as a legal entity." *City Investing Co. Liquidating Trust v. Continental Casualty Co.,* 624 A.2d 1191, 1194 (Del. 1993) (citing *In re Citadel Industries, Inc.,* 423 A.2d 500, 503 (Del.Ch.1980)). "In order to formalize the continued existence of corporate assets and to provide a mechanism for the assertion of claims as part of the 'winding up' process, the Delaware General Corporation Law continues the corporation's existence by operation of law." *Id.* "In tandem, [sections 278 and 279] insure that whether a corporation is dissolved voluntarily by its shareholders or for nonpayment of taxes, it remains a viable entity authorized to possess property as well as sue and be sued incident to the winding up of its affairs." *Id.* at 1195 (citing *Addy v. Short,* 89 A.2d 136, 140 (Del.Supr.1952)). "The intention of § 278 is to balance the public policy interest of ensuring that claimants have adequate time to bring claims against the corporation." *In re Dow Chemical International Inc. of Delaware,* 2008 WL 4603580, *2 (Del.Ch. Oct. 14, 2008) (citing *In re RegO Co.,* 623 A.2d 92, 95 (Del.Ch.1992)).

Here, IDS BPM merged with and into IDS Americas pursuant to Title 8, section 252 of the Delaware Code. (Docket Entry # 35, Ex. B). In turn, section 259 operated to transfer IDS BPM's assets and liabilities to the surviving entity, IDS Americas. *See, e.g., Gould v. American Hawaiian Steamship Company,* 331 F.Supp. 981, 998 (D.Del.1971) ("the surviving corporation after the merger ... possesses all rights and powers of [the dissolved company] as well as all liabilities and duties") (citing 8 Del.C. § 259).

Section 278 is not evoked in this case because it is not necessary to ensure that plaintiff has adequate time or a viable entity to sue. *Cf. Aluminum Company of America v. Beazer East, Inc.,* 124 F.3d 551 (3rd Cir.1997) (citing *City Investing,* 624 A.2d 1191 (Del.1993)). Where a surviving company "is an ongoing entity, with an existence separate from the dissolved corporation, which received corporate assets and assumed corporate obligations ... § 278 of Delaware's General Corporation Law [does] not bar suit against [the surviving company]." *Id.*

Plaintiff further argues, "[I]t is premature to dismiss [IDS] as a defendant at this stage of the proceedings, particularly where that entity entered into a con-

tract with Mr. Doucot more than three years after it allegedly changed its name." (Docket Entry # 19). Plaintiff suggests he "should at least be entitled to discovery and an opportunity to submit evidence on the issue of the [IDS] corporate status." (Docket Entry # 19). Although the Agreement states it was "made on 27th of October, 2006, by and between Charles Doucot ... and *IDS Scheer, Inc.,* a Delaware corporation with offices located at 1055 Westlakes Drive, Suite 100, Berwyn, Pennsylvania 19312" (Docket Entry # 28, Ex. A) (emphasis added), the inconsistency [9] is not dispositive of the issue in light of the plain language of sections 252 and 259, and the Delaware case law. The foregoing introductory paragraph of an "Executive Employment Agreement" cannot serve to unwind the merging of two or more entities and the resulting legal consequences.

For the foregoing reasons, this court finds that under Delaware law, IDS no longer existed at the time plaintiff filed the complaint and all of IDS's debts and liabilities transferred to IDS Americas on the date of their merger.

### III. *Failure to State a Claim and Ripeness*

Defendants move, under Rule 12(b)(6) to dismiss Count II, failure to pay the Retention Plan 2010 bonus, Count IV, requesting attorneys' fees, and the part of Count V under the MA Wage Act "with respect to Doucot's 2009 Plan Bonus and the Retention Plan 2010 bonus." (Docket Entry # 34). Defendants argue that these counts fail "to state any cognizable claim upon which relief can be granted." (Docket Entry # 34). Defendants also move under Rule 12(b)(1) to dismiss these three counts because they are "currently unripe for adjudication" and thus this court lacks subject matter jurisdiction. (Docket Entry # 33). This court first addresses the general standard for the Rule 12(b)(6) challenges, and then focuses on each challenged count in turn.

### A. *Rule 12(b)(6) Failure to State a Claim Standard*

To survive a motion to dismiss under Rule 12(b)(6), "the complaint must 'contain sufficient factual matter, accepted as true, to "state a claim to relief that is plausible on its face." ' " *Cunningham v. National City Bank,* 588 F.3d 49, 52 (1st Cir.2009) (quoting *Ashcroft v. Iqbal,* ── U.S. ──, 129 S.Ct. 1937, 1949, 173 L.Ed.2d 868 (2009)). "A 'plausible' claim is one in which the court can draw a 'reasonable inference that the defendant is liable for the misconduct alleged.' " *Alston v. Massachusetts,* 661 F.Supp.2d 117, 120 (D.Mass.2009).

Here, under Pennsylvania law [10] "[a] cause of action for breach of contract

---

**9.** This court additionally notes that the heading of the Agreement states, "IDS SHEER AMERICAS" and the address provided for "IDS Scheer, Inc." in the opening paragraph is the identical address to the one listed in the certificate of merger, which states, "The agreement and plan of merger is on file at the office of IDS Scheer Americas, Inc. at 1055 Westlakes Drive, Suite 100, Berwyn, Pennsylvania 19312, which shall be an office of the surviving corporation." This evidence suggests that the use of "IDS Scheer, Inc." in the body of the Agreement was in error. That said, the discrepancy is not determinative of the analysis.

**10.** The Agreement contains a "Governing Law" clause which states, "This Agreement shall be construed and interpreted and its performance shall be governed by the laws of the State of Pennsylvania without regard to conflicts of law principles of any jurisdiction." (Docket Entry # 28, Ex. 1). Since there *is no policy interest which would* override this choice and because the parties do not challenge application of Pennsylvania law, this court gives effect to that choice of

must be established by pleading (1) the existence of a contract ... (2) a breach of a duty imposed by the contract and (3) resultant damages." *CoreStates Bank, N.A. v. Cutillo,* 723 A.2d 1053, 1058 (Pa.Super.Ct.1999); *see also Boyd v. Rockwood Area School District,* 907 A.2d 1157 (Pa.Cmwlth.2006). "While not every term of a contract must be stated in complete detail, every element must be specifically pleaded." *Snaith v. Snaith,* 282 Pa.Super. 450, 422 A.2d 1379, 1382 (Pa.Super.Ct.1980).

B. *Count II–Failure to Pay the Retention Plan 2010 Bonus*

Plaintiff alleges in Count II that, "Under the Agreement, [d]efendants are obligated to pay Mr. Doucot under the 'Retention Plan 2010' if certain benchmark goals are achieved." (Docket Entry #28, Ex. A, Ex. 1). Additionally, "The benchmark goals have been achieved and Mr. Doucot has earned a minimum of $350,000 as a result." (Docket Entry #28, Ex. A, Ex. 1). Finally, "Defendants have failed [and] refuse to compensate Mr. Doucot ... [and he] is entitled to damages under the Agreement based on Defendants' breach of contract." (Docket Entry #28, Ex. A). Attached to the second amended complaint is a copy of the Agreement, complete with exhibit B comprising of the Plan Bonus and Retention Plan 2010 bonus goal tables. (Docket Entry #28, Ex. A & Ex. 1).

Both parties stipulate that the contract attached to the second amended complaint is the Agreement at issue in this litigation. (Docket Entry #28, Ex. A; Docket Entry #37). The Retention Plan 2010 bonus language therein reads:

[T]he Company will pay the Executive an additional and maximum bonus of $500,000 in accordance with the table below provided that IDS Scheer AG meets the following performance goals in 2010:

Corporate Revenue: Grow Corporate Revenue Euro 350k in 2010 over 2006 revenue

EBITA: Achieve 14% EBITA for overall corporation *in* 2010

Product Revenue: Americas to be 45% of worldwide product revenues (new license, ARIS consulting and software-maintenance revenue) *by* 2010

The allocated bonus base will begin to be earned when more than 70% of the goal has been met (0% bonus at achievement of 70%), will be fully earned when 100% of the goal has been met, will end when more than 140% of the goal has been met (233,3% bonus at achievement of 140%).

(Docket Entry #28, Ex. 1, Ex. A, Ex. B) (emphasis added).

Plaintiff submits that "[u]nder the Agreement, the bonus is earned if corporate revenue increases by 350,000 *by* 2010 over the 2006 revenue." (Docket Entry #28, Ex. A) (emphasis added). According to plaintiff, that goal was achieved in 2007 when "IDS Scheer, Inc.'s revenue [increased] by 39.5 million." (Docket Entry #28, Ex. A). Plaintiff further alleges that he "is entitled to a prorated share of the 'EBITA' and 'Product Revenue' bonuses included within the Retention Plan 2010." (Docket Entry #28, Ex. A). Plaintiff reiterates, "The allocated Retention Plan 2010 is earned, in part, upon achievement of 70% of the relevant goal and, in full, upon achievement of more than 140% of the relevant goal." (Docket Entry #28, Ex. A).

law. See *Northern Insurance Co. of New York v. Point Judith Marina, LLC,* 579 F.3d 61, 71 (1st Cir.2009) (citing *Restatement (Second) of Conflict of Laws* § 187 (1971)).

Starting with the "Corporate Revenue" goal, defendants argue both that plaintiff misrepresents the terms of the goal by substituting "by" for "in,"[11] and that "Doucot can never earn a bonus under the Retention Plan 2010 as his termination became effective on June 1, 2009, at which point he ceased to be eligible to earn any future bonuses or other compensation." (Docket Entry # 34). Plaintiff claims that he "and Defendants achieved this goal in 2007 by increasing [IDS's] revenue by 39.5 million." (Docket Entry # 28, Ex. A).

Plaintiff further responds with three arguments: (1) defendants' "attempt to restrict the meaning of the term 'earned' under the Agreement ... is belied by the clear language of the Agreement" (Docket Entry # # 19 & 38); (2) defendants "create an ambiguity in the Agreement, which results in a factual dispute that must be resolved by the fact-finder" (Docket Entry # 19); and (3) defendants' "termination of Mr. Doucot without cause ... prevented him from being employed in 2010," thus he should still be able to earn a share of the bonus (Docket Entry # 19).

■ First, looking to the "clear language of the Agreement," the paragraph explaining when the "bonus base will begin to be earned" specifically references "the goal."[12] (Docket Entry # 28, Ex. A). The natural, plain and ordinary reading, *see Cordero v. Potomac Ins. Co. of Illinois,* 794 A.2d 897, 900 (Pa.Super.Ct.2002), of this language informs that the time frame for each goal itself controls the timing for when that portion of the Retention Plan 2010 bonus begins to be earned.

■ Next, this court turns to whether the Retention Plan 2010 language is ambiguous as a matter of law. *See Drummond v. University of Pennsylvania,* 651 A.2d 572, 580 (Pa.Cmwlth.1994) ("the initial question is a legal one-whether the language is ambiguous ... [and i]f it is clear, it is a question of law") (citing *Hutchison v. Sunbeam Coal Corp.,* 513 Pa. 192, 519 A.2d 385 (1986)). " 'A contract is ambiguous if it is reasonably susceptible of different constructions and capable of being understood in more than one sense.' " *Trizechahn Gateway LLC v. Titus,* 601 Pa. 637, 976 A.2d 474, 483 (2009) (quoting *Insurance Adjustment Bureau v. Allstate,* 588 Pa. 470, 905 A.2d 462, 468–69 (2006)). "The 'reasonably' qualifier is important: there is no ambiguity if one of the two proffered meanings is unreasonable." *Id.* (citing *Murphy v. Duquesne University of the Holy Ghost,* 565 Pa. 571, 777 A.2d 418, 430 (2001) ("contractual terms are ambiguous if they are subject to more than one reasonable interpretation when applied to a particular set of facts")).

■ Neither the fact that plaintiff alters the plain language of the goal in the complaint, i.e. "[g]row Corporate Revenue Euro 350k *by* 2010 over 2006 revenue" (Docket Entry # 28, Ex. A) (emphasis added), nor plaintiff's arguments regarding what was "explained to Mr. Doucot by the Defendants prior to acceptance of employment" (Docket Entry # 19), serve to create ambiguity in this part of the Agreement. *See ITT Corp. v. LTX Corp.,* 926 F.2d 1258, 1261 (1st Cir.1991) ("[u]nder

---

**11.** Plaintiff states, "Under the Agreement, the bonus is earned if corporate revenue increases by 350,000 by 2010 over the 2006 revenue" (Docket Entry # 28, Ex. A), while the Agreement reads, "Grow Corporate Revenue Euro 350k *in 2010* over 2006 revenue" (Docket Entry # 28, Ex. 1).

**12.** The Agreement states, "The allocated bonus base will begin to be earned when more then 70% *of the goal* has been met ..., will be fully earned when 100% of the goal has been met, will end when more than 140% of the goal has been met." (Docket Entry # 28, Ex. 1) (emphasis added).

Massachusetts law, parol evidence may not be admitted to contradict the clear terms of an agreement, or to create ambiguity where none otherwise exists"); *see also Governor Apartments Inc. v. Carney,* 342 Mass. 351, 173 N.E.2d 287, 289 (1961). A court should not "distort the meaning of the language or resort to a strained contrivance in order to find an ambiguity." *Madison Construction Co. v. Harleysville Mutual Insurance Co.,* 557 Pa. 595, 735 A.2d 100, 106 (1999).

Here, the language of when that goal is earned is quite clear. Plaintiff would fully earn the 30% allocated bonus for the Corporate Revenue goal if IDS AG "[g]row[s] corporate revenue Euro 350k in 2010 over 2006 revenue." (Docket Entry # 28, Ex. 1). Under the terms of the Agreement, plaintiff would begin to earn the bonus when corporate revenue grows by 70% of the goal, or $245k. The growth of corporate revenue in 2010 must be over 2006 revenue. It distorts the meaning of "in 2010" to say it equates to "by 2010." The word "in" is defined as "a function word to indicate inclusion, location, or position within limits." *Merriam–Webster's Collegiate Dictionary* (11th Ed.2003). There must be an increase of revenue within the time limits of 2010. The word "by" commonly means "not later than." *Id.* If the Agreement stated, "by 2010," then it would mean "not later than 2010" and plaintiff's argument about the 2007 revenue increases would hold true.

"Revenue" by definition is "the total income produced by a given source." *Merriam–Webster's Third New International Dictionary Unabridged* (2002); *see also, Black's Law Dictionary* (8th Ed.2004) (defining revenue as "gross income or receipts"). Over the course of a fiscal year revenue either increases or it does not change. Therefore, given the clear language of the Agreement stating "in 2010,"

the earliest plaintiff could earn a portion, or all, of the Corporate Revenue bonus would have been the first instance of 2010. Because plaintiff could not have earned the Corporate Revenue goal until 2010 began and plaintiff's effective termination date was June 1, 2009, it follows that defendants had no duty to pay him that bonus under the terms of the Agreement.

Finally, plaintiff argues that he should be excused from the language in subsection 7(d)(i) on page six of the Agreement stating, "the Executive shall be entitled to receive all earned but unpaid (as of the effective date of such termination) ... prorated bonuses" (Docket Entry # 28, Ex. A) because "it was the Defendants' termination of Mr. Doucot without cause that prevented him from being employed in 2010." (Docket Entry # 19). The argument is unpersuasive.

 Under Pennsylvania law, "[a] party 'may not, in fact, take advantage of an insurmountable obstacle placed, by himself, in the part of the other party's adherence to an agreement. By preventing performance he also excuses it.'" *Philadelphia Television Network, Inc. v. Reading Broadcasting, Inc.,* 2005 WL 1668346, *23 (Pa.Com.Pl. July 14, 2005). The basis for this principle, known as the "prevention doctrine," is "the long-established principle of law that one should not be able to take advantage of his or her own wrongful act." 13 *Williston on Contracts* § 39:6 (2000); *see also Craig Coal Mining Co. v. Romani,* 355 Pa.Super. 296, 513 A.2d 437, 440 (Pa.Super.Ct.1986).

The court in *Riseman v. Advanta Corp.,* the case plaintiff cites, reasoned, "the jury could decide that [the company] fired [the employee] in violation of the ADEA, thereby preventing him from 'being here at the time.'" *Riseman v. Advanta Corp.,* 2001 WL 1175126, *6, 2001 U.S. Dist. LEXIS 15760, *18 (E.D.Pa. Sept. 12, 2001). The

"wrongful act" upon which the company took advantage was the violation of the ADEA. Here, defendants have not engaged in a "wrongful act." On the contrary, defendants followed the procedures and rights outlined in subsection 7(d) of the Agreement and exercised the right to "terminate the Executive's employment under [the] Agreement at any time for any reason or no reason by giving the Executive fourteen (14) days prior written notice of such termination." (Docket Entry # 28, Ex. A). Therefore, the excuse argument is without merit. Plaintiff therefore fails to plausibly plead a breach of contract claim for the Corporate Revenue goal amount.

Moving to the "EBITA" goal, for similar reasons addressed above regarding the Corporate Revenue goal, plaintiff does not allege a plausible claim. The EBITA goal requires an "achieve[ment of] 14% EBITA for the overall corporation in 2010." (Docket Entry # 28, Ex. A) (emphasis added). EBITA is an acronym for "earnings before interest, taxes ... and amortization." *Bukuras v. Mueller Group, LLC,* 592 F.3d 255, 259 (1st Cir.2010) ("the bonuses were conditioned on the Company meeting certain financial targets, measured in terms of earnings before interest, taxes, depreciation, and amortization (or, "EBITA")"). Logically, that percentage of earnings may only be calculated after EBITA is determined for the entire corporation after the end of 2010.[13] Since plaintiff's effective termination date was June 1, 2009, he could not have "earned" any of the bonus allocated to the EBITA goal.

■ Turning finally to the "Product Revenue" goal, the language is contradic-

tory and ambiguous when read in context. As previously stated, " 'A contract is ambiguous if it is reasonably susceptible of different constructions and capable of being understood in more than one sense.' " *Trizechahn Gateway LLC v. Titus,* 601 Pa. 637, 976 A.2d 474, 483 (2009) (quoting *Insurance Adjustment Bureau v. Allstate,* 588 Pa. 470, 905 A.2d 462, 468–69 (2006)). The first paragraph of the Retention Plan 2010 language states that plaintiff could receive a "bonus of $500,000 in accordance with the table below provided that IDS Scheer AG meets the following performance goals in 2010." (Docket Entry # 28, Ex. A) (emphasis added). The language of the Product Revenue goal itself then reads, "[IDS] Americas to be 45% of worldwide product revenues ... by 2010." (Docket Entry # 28, Ex. A) (emphasis added). Use of the preposition "by" in the Product Revenue goal contradicts the preposition "in" located in the general Retention Plan 2010 language above. Taken together, "by" in the Product Revenue goal language could mean: (1) "by the start of 2010" or "before 2010"; or (2) "by the end of 2010" or "by any time during 2010." Given this ambiguity, "a trier of fact [could] be called upon to resolve conflicting parol evidence relevant to what the parties intended." *Id.*

Regardless, the claim as it concerns the Product Revenue goal is not plausible because plaintiff could not have "earned" that portion of the bonus by his effective termination on June 1, 2009. As previously mentioned under the EBITA goal analysis, a percentage goal may only logically be calculated at the end of the time frame for the goal. This is because a percentage-in

---

**13.** This court acknowledges that the word "in" under the terms of the EBITA goal is ambiguous because it is unclear whether the percentage goal must simply happen one time "in 2010" or whether the percentage goal must be met based on the year end EBITA financials for earnings "in 2010." The former interpretation seems unreasonable. Regardless, this potential ambiguity has no bearing on whether plaintiff "earned" the allocated bonus as of plaintiff's termination on June 1, 2009.

this case IDS Americas' percentage of "worldwide product revenues"-is susceptible to increasing and decreasing. Here, the increasing and decreasing of the percentage of "worldwide product revenues" depends on the relative product revenue generated by the various divisions of the entire company, IDS AG.

It stands to reason, therefore, that the calculation of the percentage of the goal that has been "earned" must occur no earlier than at the *end* of the time frame for the goal. Here, the end of that time frame, i.e. "by 2010" or sometime "in 2010," occurs at the earliest on the close of business on the last day before the start of 2010, i.e. December 31, 2009. Therefore, plaintiff could not have "earned" the bonus under the Product Revenue goal by the time of his effective termination on June 1, 2009.

In sum, plaintiff does not meet the plausibility standard under *Twombly*[14] for all of Count II because he could not have earned any of the bonus goals by his effective termination date of June 1, 2009. Since no part of Count II remains, there is no need to engage in a ripeness analysis for that count.

## C. *Count IV–Attorney's Fees*

In Count IV plaintiff claims, "[I]n the event that Mr. Doucot prevails in this action, he is entitled to reasonable attorney's fees, costs and disbursements." (Docket Entry # 28, Ex. A). Defendants move to dismiss this claim arguing it is not ripe for adjudication since "no party has yet prevailed in this action." (Docket Entry # 34). For the following reasons, the

claim is treated as a request for relief, *see Estate of Barrett ex rel. v. United States,* 337 F.Supp.2d 370, 372 n. 1 (D.Mass.2004) ("[b]ecause ... 'Count XIII' is a request for attorneys' fees, I consider it a request for relief rather than a cause of action"), and the parties are instructed to move for attorneys' fees pursuant to Rule 54(d)(2)(A), Fed.R.Civ.P., following the entry of a final judgment in this matter.[15]

The "American Rule" for awarding attorney's fees is that they are "not ordinarily recoverable in the absence of a statute or enforceable contract providing therefor [sic]." *Fleischmann Distilling Corp. v. Maier Brewing Co.,* 386 U.S. 714, 717, 87 S.Ct. 1404, 18 L.Ed.2d 475 (1967). In Pennsylvania, courts "consistently follow[ ] the general, American rule that there can be no recovery of attorneys' fees from an adverse party, absent an express statutory authorization, a clear agreement by the parties or some other established exception." *Commonwealth v. Garzone,* 993 A.2d 1245, 1255 (Pa.Super.2010); *see Mosaica Academy Charter School v. Com. Dept. of Education,* 572 Pa. 191, 813 A.2d 813, 822 (2002); *see also Lucchino v. Commonwealth,* 570 Pa. 277, 809 A.2d 264, 267 (2002).

The First Circuit instructs, "When a contractual fee provision is included by the parties, the question of what fees are owed 'is ultimately one of contract interpretation,' and [the court's] primary obligation is simply to honor the agreement struck by the parties." *AccuSoft Corp. v. Palo,* 237 F.3d 31, 61 (1st Cir.2001). Here, the relevant contract provision states, "If

---

14. *Bell Atlantic Corp. v. Twombly,* 550 U.S. 544, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007).

15. Plaintiff requested attorney's fees in his "request for relief." sections of the first amended complaint (Docket Entry # 6) and second amended complaint (Docket Entry

# 28, Ex. A). Defendants likewise requested attorneys' fees in their motion to dismiss the first amended complaint (Docket Entry # 13) and partial motion to dismiss the second amended complaint (Docket Entry # 33).

an action at law or in equity is necessary to enforce or interpret the terms of this Agreement, the prevailing party shall be entitled to recover, in addition to any other relief, reasonable attorneys' fees, costs and disbursements." (Docket Entry # 28, Ex. A).

■ "Attorney's fees can be either an element of damages to be proven at trial or a collateral matter to be determined following adjudication of the relevant claims." *Pride Hyundai, Inc. v. Chrysler Financial Co., LLC,* 355 F.Supp.2d 600, 602 (D.R.I.2005). "[C]ourts have differentiated between claims for attorney's fees based on 'prevailing party' contractual provisions and claims for attorney's fees based on other types of contractual provisions." *Rockland Trust Company v. Computer Associated International, Inc.,* 2008 WL 3824791, *5 (D.Mass. Aug. 1, 2008) (collecting cases). Where, as here, a "prevailing party" provision exists, courts treat the request for fees as collateral, since "the amount of attorney's fees does not become fully liquidated until conclusion of trial on the merits." *Id.* at *6 (finding no "traditional prevailing party provision" and holding "that CA's claim for attorney's fees would be viewed as a substantial element of damages under the existing case law and must be proved to the trier of fact").

■ In this case, the Agreement provides that only the "prevailing party" is entitled to recover attorney's fees. *See, e.g., Creeks v. Creeks,* 422 Pa.Super. 432, 619 A.2d 754, 757–58 (Pa.Super.Ct.1993) ("[i]n the event enforcement proceedings are instituted because of a[n] ... alleged breach of this Agreement or any Court Order entered thereunder by either party, the prevailing party in such proceedings shall be entitled to an award of counsel fees for all time reasonably expended in connection with the enforcement of this Agreement"). The language in the Agree-

ment does not expressly require a claim for fees to be tried during the case on its merits. *See De Lage Landen Financial Services, Inc. v. Rozentsvit,* 939 A.2d 915, 924 (Pa.Super.Ct.2007) ("the lease itself did not require [a party's] claim for costs to be tried during the case ... [and] as such, the right to counsel fees arose as a function of the favorable verdict in the underlying litigation"). Therefore, while "the agreement in this case contained the necessary 'clear agreement of the parties' that in the event of a breach of the Agreement, the breaching party must pay the attorney fees," *McMullen v. Kutz,* 603 Pa. 602, 985 A.2d 769, 775 (2009), the amount of such fees, if any, and the identity of the prevailing party is fully determinable only at the conclusion of the case. Accordingly, this court awaits the final adjudication on the merits before it will entertain requests for attorney's fees.

As a final note, plaintiff asserts, "In light of Defendants' concession that Mr. Doucot was owed his 2009 Plan Bonus, as demonstrated by their payment of a 2009 Plan Bonus to Mr. Doucot on or about March 15, 2010, ... Defendants' arguments in support of dismissal of Mr. Doucot's claim for attorneys' fees pursuant to Count IV of the Second Amendment Complain are clearly undercut." (Docket Entry # 38). This court finds that payment of the 2009 Plan Bonus was in the ordinary course of IDS America's bonus payment system (Docket Entry # 35, Ex. C), and therefore, the payment of the "2009 Plan Bonus to Mr. Doucot on or about March 15, 2010," did not by itself confer "prevailing party" status on plaintiff at this point. *See, e.g., Profit Wize Marketing v. Wiest,* 812 A.2d 1270, 1275–76 (Pa.Super.Ct.2002) (prevailing party status "is still limited to those circumstances where the fact finder declares a winner and the court enters judgment in that party's favor[, and] ...

does not accompany a compromise or settlement").

### D. *Count V–MA Wage Act*

Finally, plaintiff claims that he "is entitled to remuneration for all earned but unpaid bonuses and benefits under the Plan Bonus and the Retention Plan 2010, as well as pay-out for his vacation days during his six-month severance period." (Docket Entry # 28, Ex. A). Further, "[d]efendants' failure to remit payment of these wages to Mr. Doucot is a violation of the [MA] Wage Act." (Docket Entry # 28, Ex. A). He relies on language in the MA Wage Act stating, "any employee discharged from such employment shall be paid in full on the day of his discharge." Mass.Gen. L. ch. 149, § 148; (Docket Entry # 19).

■ Under Massachusetts law, to state a claim under the MA Wage Act, plaintiff "must prove (1) he was an employee under the statute; (2) his deferred compensation constitutes a 'wage' under the statute; [and] (3) the defendants violated the Act by not paying him his wages in a timely manner." *Stanton v. Lighthouse Financial Services, Inc.,* 621 F.Supp.2d 5, 10 (D.Mass.2009) (citing *Allen v. Intralearn Software Corp.,* 2006 WL 1277813, *1 (Mass.App.Ct. Apr. 24, 2006)). Plaintiff alleges all three in the complaint. (Docket Entry # 28, Ex. A). Defendants move to dismiss Count V insofar as it relates to plaintiff's bonuses because "his 'bonus' is not a type of wage that is covered by the [MA] Wage Act." (Docket Entry # 34). For the following reasons, this court finds that the bonuses are not "wages" protected by the MA Wage Act.

In an early decision, the Massachusetts Supreme Judicial Court concluded that the Massachusetts legislature enacted section 148 to limit "the interval between the completion of a work week and the payday on which the wages earned in that week will be paid." *American Mutual Liability Insurance Co. v. Commissioner of Labor and Industries,* 340 Mass. 144, 163 N.E.2d 19, 20 (1959). "The statute was intended and designed to protect wage earners from the long-term detention of wages by unscrupulous employers." *Cumpata v. Blue Cross Blue Shield of Massachusetts, Inc.,* 113 F.Supp.2d 164, 167 (D.Mass.2000). The Massachusetts Appeals Court has maintained a narrow scope of the MA Wage Act. *See Id.; see, e.g., Prozinski v. Northeast Real Estate Services, LLC,* 59 Mass. App.Ct. 599, 797 N.E.2d 415, 419 (2003) ("[w]e have construed the wage act narrowly"); *Commonwealth v. Savage,* 31 Mass.App.Ct. 714, 583 N.E.2d 276, 278 (1991) ("[f]rom the caption to that act and from the placement of the provison [sic] in the weekly payment statute, one infers a Legislative purpose to assist employees who would ordinarily be paid on a weekly basis, such as retail salespeople, and for whom commissions constitute a significant part of weekly income").

■ "Where the language of a statute is plain, it is 'the sole function of the courts . . . to enforce it according to its terms.'" *D'Avella v. McGonigle,* 429 Mass. 820, 711 N.E.2d 882, 885 (1999). The MA Wage Act requires employers to pay employees earned wages "in a timely fashion, according to the parameters of the statute." *Okerman v. VA Software Corp.,* 69 Mass.App. Ct. 771, 871 N.E.2d 1117, 1121 (2007). It "refers to 'weekly' or 'biweekly' wages having been earned during a particular pay period and specifically includes in its definition 'holiday or vacation pay' as well as definitely determined commissions." *Prozinski v. Northeast Real Estate Services, LLC,* 797 N.E.2d at 420.

Therefore, according to the Massachusetts Appeals Court, "[t]here is . . . no need to resort to the popular meaning of

the term 'wages,' to *Black's Law Dictionary,* or to other statutes using the term 'wage.'" *Id.; see NaviSite, Inc. v. Cloonan,* 2005 WL 1528903, *13–14 (Mass.Super.Ct. May 11, 2005).

■ In dispute is whether the Bonus Plan and Retention Plan 2010 bonuses constitute "wages" under the MA Wage Act. The term "bonus" does not appear in the plain language of the act. *See* M.G.L. ch. 149, § 148. "Generally, bonuses are not 'wages earned' within the meaning of Mass. Gen. Laws ch. 149, § 148." *Sterling Research, Inc. v. Pietrobono,* 2005 WL 3116758, *12 (D.Mass. Nov. 21, 2005); *see NaviSite, Inc. v. Cloonan,* 2005 WL 1528903, at *13–14 ("retention bonus and the performance bonus ... lie well outside the statute's reach"). Additionally, "[c]ourts have distinguished wages, which include assured compensation and compensation equivalents such as accrued vacation pay and sick leave, from compensation 'triggered by contingencies' [that are] thus outside the scope of the [MA] Wage Act." *Dennis v. Jager, Smith & Stetler, P.C.,* 2000 WL 782946, *1 (Mass.Super. Ct. April 10, 2000) (holding that the plaintiff's "substantial and irregular compensation, in the form of a draw, ... is not afforded the protections of the [MA] Wage Act").

Here, plaintiff appears to argue, without citation to Massachusetts law, that the bonuses fall under the language applying to commissions and suggests they are "definitely determined." (Docket Entry # 19). Simply addressing the bonuses in terms of commissions does not make them commissions under the MA Wage Act. *See Beaule v. M.S. Inserts and Fasteners Corp.,* 2004 WL 1109796, *2 (Mass.Super.Ct. Feb. 24, 2004) ("[s]imply because the [defendant's] employees called the bonuses commissions, does not mean that they are commissions"). Here, plaintiff argues, "[t]he Retention Plan 2010 was explained to Mr. Doucot by the Defendants prior to his acceptance of employment to act as an alternative to an employee equity plan that would provide him with a vested interest in bonus payments in the same way that an employee would obtain a stock grant or option." (Docket Entry # 19). This is consistent with the Massachusetts Supreme Court's understanding that, "The offer of a bonus is the means frequently adopted to secure continuous service from an employee, to enhance his efficiency and to augment his loyalty to his employer." *Attorney General v. Woburn,* 317 Mass. 465, 58 N.E.2d 746, 747 (1945).

■ "Massachusetts courts have held that the term 'commission' refers to 'employees who would ordinarily be paid on a weekly basis ... and for whom commissions constitute a significant part of weekly income.'" *Wilkie v. NETS, Inc.,* 2005 WL 3105692, *3 (Mass.Super.Ct. Oct. 16, 2005); *Commonwealth v. Savage,* 583 N.E.2d at 276. "For purpose of the [MA] Wage Act, payments qualify as commissions under the Act only if they satisfy a series of factors: regularity of commission, regularity of commission payment, relation between salary and commission, and absence of triggering contingencies." *Wilkie v. NETS, Inc.,* 2005 WL 3105692, at *3. "Courts have held that where the payment is erratic, such as a yearly bonus, the payment does not constitute a commission as defined under the Act." *Id.; cf. Dennis v. Jager, Smith & Stetler, P.C.,* 2000 WL 782946, at *1; *see also Baptista v. Abbey Healthcare Group, Inc.,* 1996 WL 33340740, at *4 (D.Mass. April 10, 1996) (declining to extend definition of "wages" to stock options).

Given the foregoing Massachusetts case law the Plan Bonus and the Retention Plan 2010 bonus are not "wages" protected by the MA Wage Act. Therefore, insofar as

194

the Count V concerns these bonuses, it is subject to dismissal.

## CONCLUSION

For the foregoing reasons and in accordance with the analysis therein, the motion to dismiss (Docket Entry # 30) is **DENIED,** and the partial motion to dismiss (Docket Entry # 33) is **ALLOWED.**